**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **WILLIAM H. YELLAND,** | : |
| | : |
| **Plaintiff** | :    **CIVIL ACTION NO. 3:16-2080** |
| | : |
| **v.** | :    **(JUDGE MANNION)** |
| | : |
| **ABINGTON HEIGHTS SCHOOL** | |
| **DISTRICT***, et al.,* | : |
| | : |
| **Defendants** | : |

# M E M O R A N D U M

Plaintiff William H. Yelland was a science teacher at the Abington Heights Middle School ("AHMS") in the Abington Heights School District ("AHSD") from 2013 until May 7, 2015. On April 8, 2015, allegations of physical assault were made by the parents of one of plaintiff's eighth grade students to AHMS Principal Michael Elia and AHMS Vice Principal Eduardo Antonetti. After meeting with the parents, Elia and Antonetti assured the parents that plaintiff would not return to the classroom and the Department of Human Services Office of Children, Youth and Families ("CYF") as well as the South Abington Police Department were contacted regarding the allegations against plaintiff. The next day, AHSD officials, including defendants AHSD Superintendent Michael Mahon, Elia and Antonetti, initiated an investigation into the assault allegations and discussed the allegations with plaintiff during a meeting. The parties now dispute whether that meeting was sufficient to satisfy due process requirements and the defendants have moved for

summary judgment on plaintiff's 14th Amendment claim in which he alleges insufficient pre-termination process. The defendants also move for summary judgment with respect to plaintiff's a state law malicious prosecution claim against Mahon, Elia and Antonetti. For the reasons discussed below, the court will **DENY IN ITS ENTIRETY** the defendants' motion for summary judgment.

## I.    BACKGROUND[1]

The remaining claims in plaintiff Yelland's civil rights case, filed pursuant to 42 U.S.C. §1983, are: 14th Amendment pre-deprivation procedural due  process claim contained in Count I of his complaint against AHSD and, against Mahon, Elia and Antonetti in their individual capacity; claim for punitive damages regarding Count I against Mahon, Elia and Antonetti in their individual capacity; and a state law malicious prosecution claim contained in Count III against Mahon, Elia and Antonetti.

Specifically, in Count I, plaintiff alleges that he was not afforded pre-deprivation due process by defendants and that the April 9, 2015, meeting did not satisfy the requirements of Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Plaintiff alleges that after his indefinite suspension without pay, defendants conducted a "sham investigation" culminating in his May 7, 2015 termination based on his alleged

---

[1]Since the complete background of this case was detailed in the court's prior decisions, it shall not be fully repeated herein. (Docs. 18 & 43).

April 8th "'physical[] attack' on [T.K.] as well as alleged physical attacks against other students [C.K. and S.D.]."

In Count III, plaintiff asserts a state law claim of malicious prosecution against the defendants Mahon, Elia and Antonetti.

As relief in his complaint, plaintiff seeks an injunction from the court to order the defendants to reinstate his employment, compensatory damages, including front pay and back pay, punitive damages, nominal damages as well as attorneys' fees pursuant to 42 U.S.C. §1988 and costs.

The court has jurisdiction over this case pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a) because plaintiff avers violations of his due process rights under the 14th Amendment of the U.S. Constitution. The court can exercise supplemental jurisdiction over plaintiff's state law malicious prosecution claim under 28 U.S.C. §1367. Venue is appropriate in this court since the alleged constitutional violations occurred in this district and all parties are located here. *See* 28 U.S.C. §1391.

On December 1, 2017, the remaining defendants filed a motion for summary judgment under Fed.R.Civ.P. 56 with respect to plaintiff's claim for pre-termination due process, his claim for malicious prosecution, and his claim for punitive damages. (Doc. 74). Defendants also assert that the individual defendants are immune from suit. Defendants' motion has been briefed and exhibits were submitted along with a statement of material facts

and plaintiff's response.[2]

## II.  MATERIAL FACTS[3]

Plaintiff was a science teacher at the AHMS in the AHSD from 2013 until May 7, 2015. On April 8, 2015, allegations of physical assault were made by the parents of one of plaintiff's eighth grade students, ("T.K."), to Elia and Antonetti. Specifically, T.K.'s mother, M.K., called Antonetti and indicated that the plaintiff had pressured pointed her son in class, and that she wanted to come to the school to find out what happened between her son and the plaintiff. In the meantime, Antonetti spoke to the plaintiff about the incident, and relayed that M.K. was angry and that there were marks on T.K. that the plaintiff must have caused and, that M.K. was coming to the school to complain. Antonetti told the plaintiff that "we'll talk to this parent to see what's going on. It could be nothing. I just want to find out what's going on." Antonetti then told the plaintiff go home for the day.

Later that day, Antonetti and Elia met with T.K. and his parents. During

---

[2]Since the parties correctly state the standard for a summary judgment motion in their briefs, the court will not repeat it herein. *See also* Moffitt v. Tunkhannock Area School District, 160 F.Supp.3d 786, 792-93 (M.D.Pa. 2016). Also, since the court has stated the standards for a constitutional claim pursuant to §1983 and a claim against AHSD under Monell v. Dep't. of Soc. Servs., 436 U.S. 658, 694 (1978), in its prior decision, they will not be fully repeated.

[3]The court only states the facts that are material to the issues at hand. Legal conclusions, background facts, allegations and arguments will not be included.

the meeting, T.K. and his parents stated that while in class, the plaintiff came from behind T.K., put his hands around T.K.'s collarbone/neck area, and then used his thumbs to apply a pressure point under T.K.'s chin, leading to a physical struggle between the two. Elia testified that he saw "red marks underneath [T.K.'s] chin, some smaller red marks [ ] on the side of his chin and some small scratch marks back by his ear." During the meeting, alleged incidents regarding other students and the plaintiff were also discussed, including one student who was allegedly made to lick the floor and another student who was allegedly stabbed with a pen. Elia then took T.K.'s statement and left the meeting to call Mahon. Elia later testified that "[he] received information from a student and [he] reported that information to my superior related to something that happened in the classroom."

Following the meeting, Elia and Mahon decided to interview students and file Childline Reports, as required under the Pennsylvania Child Protective Services Law, 23 Pa.C.S. §6318, *et seq*. ("CPSL"). Specifically, Elia and Mahon decided to file a Childline Report with respect to T.K. on April 8th and thereafter filed Reports for C.K. and S.D. Also, the South Abington Township Police Department was contacted by defendants regarding T.K.'s allegations about the plaintiff pursuant to the CPSL. Elia could not remember if he was on the phone call to the police.

The plaintiff's evidence of the incident with T.K. differs from the defendants' version of events and reveals that on April 8, 2015, he was returning quizzes in class and T.K. began gloating about his score. The

plaintiff then put his hand on T.K.'s shoulder to let him know that gloating was disruptive. T.K. then slid his chair backwards into the plaintiff and began to pull down on plaintiff's arm. The plaintiff then pulled his arm up to get out of T.K.'s grasp. The plaintiff's evidence also shows that the encounter was not considered a big deal by other classmates, that it was horseplay, and that plaintiff and T.K. were smiling and laughing at the time. The plaintiff also submitted evidence showing that other students did not feel unsafe or afraid, nor did they see any marks, bruises or scratches on T.K. afterward.

Regardless, it is undisputed that a physical incident between the plaintiff and T.K. occurred in the classroom on April 8th and that marks on T.K. were observed by some people.

Later on April 8th, the plaintiff called T.K.'s parents and left a voicemail regarding the incident with their son and said that he was "absolutely mortified" about it. The plaintiff later testified that he was actually mortified regarding how T.K.'s mother perceived the incident but stated that he did not apologize for the incident and he did not know what T.K. had specifically alleged about it.

About 5:30 p.m. that same day, plaintiff was given his *Miranda* rights and interviewed by the South Abington Police Department. Plaintiff gave a written statement about the incident with T.K., indicating he pushed on a pressure point on T.K.'s shoulder and wrestled with T.K. for five to ten seconds. Plaintiff also stated that while he was pulling his own arm, T.K. was also pulling his arm, and that his thumb went under T.K.'s chin and apparently

6

left bruises.

Also on the evening of April 8th, Mahon told Elia to call the plaintiff and tell him to come to the administration building the next morning for a meeting. The parties dispute whether Elia told the plaintiff that the meeting would relate to the incident with T.K. and whether the plaintiff was advised to bring a Union representative with him. However, it is undisputed that when Elia called the plaintiff, the plaintiff was aware of the serious nature regarding the incident with T.K., that T.K.'s parents were upset and, that the police were involved.

According to the plaintiff's evidence, the plaintiff was only told to show up at the administration building on April 9th and he was not given any other information. The plaintiff stated that because he was unaware that a meeting regarding T.K.'s allegations was to take place, he did not call Tim Moher, President of the Abington Heights Education Association, i.e., his Union representative. The plaintiff also stated that he never spoke with either Moher or John Holland, Region Field Director for Pennsylvania State Education Association, before arriving for the meeting on April 9th. In fact, Moher testified that Thomas Quinn, Assistant Superintendent, contacted him on April 8, 2015, and that Quinn told him "[Yelland] was suspended and that there would be an investigation." Holland testified that Moher then called him and asked him to attend the April 9th meeting.

On April 9, 2015, AHSD officials, including Mahon, Elia and Antonetti, as well as Quinn, held a meeting with the plaintiff and discussed the April 8th incident between T.K. and the plaintiff. Holland and Moher, the teacher's

Union representatives, were also present. Prior to the start of the meeting, Holland advised the plaintiff what a *Loudermill* Hearing was and advised him of his *Weingarten* right.[4]

Mahon ran the April 9th meeting and began asking the plaintiff questions about the incident with T.K. The parties dispute each other's version of the meeting. Mahon testified that he confronted the plaintiff directly with the allegations made against him. There is no dispute that Mahon asked the plaintiff about his interaction with T.K. Mahon stated that he explained to the plaintiff that T.K.'s parent contacted the administration and told them that there was an incident at school with their son and plaintiff, and that afterwards it left a mark on their son. Mahon indicated that he also advised the plaintiff that T.K. had bruises or marks from plaintiff's actions. Moher's notes of the meeting also indicated that the plaintiff was informed that it was inappropriate contact that caused marks on T.K. There is also no dispute that Mahon told the plaintiff at the meeting that he reported the April 8th incident to law enforcement.

The defendants' evidence also shows that the plaintiff demonstrated his interactions with T.K. at the April 9th meeting. In particular, Mahon asked plaintiff about a pressure point, and Mahon stated that plaintiff stood up and

---

[4] *See* Com., Office of Admin. v. Pa. Labor Relations Bd., 591 Pa. 176, 916 A.2d 541 (2007) (The PA Supreme Court stated that a public employee's *Weingarten* right was "the right to be accompanied by a union representative during an interview in which the employee reasonably fears that discipline may be imposed by the employer." (citing National Labor Relations Board v. J. Weingarten, Inc., 420 U.S. 251, 95 S.Ct. 959 (1975)).

demonstrated a pressure point. However, the plaintiff later testified that he did not recall "demonstrating" anything at the April 9th meeting.

The plaintiff however testified he was not specifically advised about T.K.'s version of the interaction with him and any evidence regarding the April 8th incident. Indeed, Moher substantiated plaintiff's testimony that he was only asked open-ended questions by Mahon regarding his interaction with T.K. without reference to any specific allegations, including T.K.'s version, and without reference to any evidence. In particular, Moher testified that Mahon did not state actual allegations against the plaintiff and that he did not request the plaintiff to respond to specific allegations. Thus, according to the plaintiff and his evidence, he was not given the opportunity to respond to specific allegations made by T.K. and to specific evidence against him.

In his deposition, the plaintiff described the meeting on April 9th as follows:

> I don't know. Again, we are going back now to very specific details about an event from 2½ years ago. All I remember at that meeting is there was a bunch of open ended questions, it seems like they were just trying to get me for something. There weren't any charges, there was no evidence. There was nothing for me to respond to because there was nothing and they knew that there was nothing.

Holland's testimony also supports plaintiff's version of the meeting. Holland testified that Mahon did not explain any charges to plaintiff and stated that "when we arrived at the meeting, Mr. Mahon started asking Mr. Yelland open ended questions," "I wasn't sure why I was there until Mr. Mahon started

9

asking him open ended questions," and that "there was no explanation when we first got started about the nature of the meeting."

Additionally, when Antonetti was asked "what sorts of questions did Mr. Mahon ask about [T.K.]", he testified that "[Mahon] asked [plaintiff] to describe what happened in class on [April] 8th and [that] he had some questions about that incident."

During the meeting on April 9th, plaintiff was also asked by Mahon whether he made another student lick the floor in a separate alleged incident. After which the plaintiff met with the Union representatives and indicated that he was invoking his Fifth Amendment privilege and was not going to answer any more questions. Plaintiff later explained that he invoked his Fifth Amendment right since he believed that defendants were "fishing for everything and anything that they could possibly find." Mahon wanted to continue the questioning of plaintiff on the topics they had discussed, but Holland reminded plaintiff that he invoked his Fifth Amendment right, after which the meeting ended.

At the conclusion of the meeting, Holland stated that he was aware of what was being alleged against plaintiff. However, plaintiff indicates that it was not possible for Holland to have been aware of all of the allegations and evidence against him since Mahon sent him letters on April 9, 2015 and May 7, 2015, which included accusations related to T.K., C.K. and S.D. and, the specific accusations regarding C.K. and S.D. were not yet known on April 9th since defendants had not yet spoken to these two students. Additionally, in

the May 7, 2015 letter Mahon sent plaintiff, seven grounds for dismissal were stated related to three students, T.K., C.K. and S.D. However, six of the seven grounds related to either C.K. or S.D. even though defendants did not speak to these two students prior to the April 9, 2015 meeting. As such, defendants could not have advised plaintiff of any specific allegations personally made by C.K. and S.D. at the April 9th meeting. Nor could defendants have provided plaintiff with any specific evidence regarding the allegations concerning C.K. and S.D. at the meeting.

Plaintiff points out that subsequently, S.D., the student who he allegedly made lick the floor, testified that he was never forced to lick the floor and denied telling defendants that he was made to do it. Plaintiff also points out that C.K. testified later that he was never stabbed by a pen and that he never told defendants that he was stabbed.

When the April 9th meeting with plaintiff was over, Antonetti testified that, "[t]he only conclusion I could draw at that point was that something happened–something physical happened, but I did not have a clear conclusion of exactly what happened or how."

Plaintiff's evidence challenges whether the incident with T.K. was inappropriate contact and, argues that the incident was only "horesplay" and that marks on T.K. were not observed by some others in the class. The facts show that plaintiff was advised about the alleged seriousness of the incident with T.K. at the meeting, and that plaintiff provided responses to Mahon's allegations regarding this incident. However, plaintiff testified that at the

meeting he was not aware of the specific allegations made by T.K. and of any specific evidence against him regarding the charges.

After the April 9th meeting, Mahon sent plaintiff a letter dated the same day stating that "[o]n April 8, 2015 a parent made an accusation that you physically abused his son earlier that same day" and, that subsequently, "the [AHSD] received reports of two additional incidents where you are again being accused of physical abuse of students." The letter advised plaintiff that AHSD took seriously its obligation to investigate instances of alleged abuse against its students and that if he wished to reconsider his refusal to answer any more questions about the allegations against him, he could arrange an appointment to do so. In the letter, Mahon then advised plaintiff that he was suspended without pay based on the credible allegations of physical abuse and his refusal to answer any more questions regarding the allegations.

Additionally, on the night of April 8, 2015, a Lackawanna County Assistant District Attorney ("ADA") was contacted regarding the incident between plaintiff and T.K. by members of AHSD administration. During the following days, the ADA testified that "[she] communicated with the school district" and, that she and "[Mahon] communicated about the nature of the complaint that was made." The ADA then remained in communication [with Mahon] really throughout the entire process in terms of [her] updating him on the decision to charge, trial date, things of that nature." She stated that "[t]he school district also provided [her] with information" and that "there was sort of open lines of communication both ways." Also, during the criminal process the

12

ADA and Mahon remained in contact about the case and she complimented Mahon that his "administration and faculty have been extremely helpful as we prepare for [trial]."

On April 9, 2015, T.K. was seen at the Children's Advocacy Center in Scranton, where he was forensically interviewed and medically examined. He described his version of what occurred in school on the prior day. The ADA present witnessed bruises on T.K.

AHSD officials then interviewed several students and eventually forwarded the results of their investigation to the Lackawanna County District Attorney's Office. Plaintiff contends that his evidence shows defendants withheld exculpatory information when they provided information to the county prosecutor and that they failed to disclose the accounts of several eyewitnesses that T.K. was laughing, that the "the whole thing was a joke", that the interaction was "not vicious", that plaintiff was not trying to injure T.K., and that T.K. appeared to be "having fun the entire time".

Two days after defendants provided their investigative report to the prosecutor and detective, criminal charges were filed against plaintiff. The Lackawanna County detective who filed the charges against the plaintiff testified that "[i]f there was information that's exculpatory, we probably wouldn't be drafting [a criminal] complaint." The ADA testified that before the charges against plaintiff were filed they looked for exculpatory information but did not find any.

Specifically, after receiving the district's report, the detective prepared

a criminal complaint and affidavit of probable cause on April 29, 2015, which included statements made by T.K. Subsequently, the DA filed criminal charges of simple assault and endangering the welfare of children against plaintiff based on the allegations of assault made by T.K. arising out of the April 8, 2015 incident.

Plaintiff had a preliminary hearing and the Magisterial District Judge bound over both charges against him for trial on June 10, 2015. No one from AHSD testified at the hearing. Four students did testify at the hearing about the April 8th incident and stated that they believed it to be in a joking manner.

Plaintiff's criminal trial was held in November 2015, and he was found not guilty by a jury on all charges. *See* Lackawanna County Court criminal docket in *Com. of PA v. Yelland*, Docket No. CP-35-CR-1178-2015.[5]

## III. DISCUSSION

### A. 14th Amendment Pre-termination Due Process Claim, Count I

The basis of plaintiff's pre-termination due process claim is that on April 8 and 9, 2015 defendants failed to provide him with sufficient notice of the charges and evidence against him and an opportunity to present his side of the story. Plaintiff argues that the record is disputed as to whether defendants advised him that there were serious accusations against him and as to

---

[5]The Lackawanna County Criminal Docket for Yelland's criminal cases can be found at http://ujsportal.pacourts.us. The court takes judicial notice of Yelland's Lackawanna County Court Criminal Docket.

whether he was provided with the specific evidence supporting those accusations.

"A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." Rode v. Dellarciprete, 845 F.2d 1195, 1207-08 (3d Cir. 1988). *See also* Sutton v. Rasheed, 323 F.3d 236, 249 (3d Cir. 2003)(citing *Rode*). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode, 845 F.2d at 1207.

Initially, the court finds that plaintiff's evidence, detailed above, shows that Mahon, Elia and Antonetti had sufficient personal involvement regarding plaintiff's 14th Amendment claim.

Next, the court finds that plaintiff was a professional educator employed by AHSD under the Pennsylvania School Code. Plaintiff was a member of the teacher's Union and he had a protected property interest in his continued employment with AHSD. In fact, defendants do not contest these findings. Thus, there is no dispute that plaintiff was entitled to procedural due process prior to suspension.

Courts, including this court, have held that suspensions of public employees without pay require pre-deprivation process. *See* Moffitt v. Tunkhannock Area School Dist., 2013 WL 6909958 (M.D.Pa. Dec. 31, 2013).

As this court stated in Moffitt v. Tunkhannock Area School District, 160 F.Supp.3d 786, 793 (M.D.Pa. 2016):

Prior to termination, *Loudermill* requires "a pretermination

15

opportunity to respond, coupled with post-termination administrative [or judicial] procedures." Morton v. Beyer, 822 F.2d 364, 367 (3d Cir. 1987) (quoting Loudermill, 470 U.S. at 546, 105 S.Ct. 1487). The pretermination hearing, "though necessary, need not be elaborate," and it must at least entail: 1) "oral or written notice of the charges," 2) "an explanation of the employer's evidence," and 3) "an opportunity for the employee to tell his side of the story." Loudermill, 470 U.S. at 545, 105 S.Ct. 1487.

Thus, since plaintiff Yelland was a public employee with a legitimate interest in continued employment, he was entitled to "oral or written notice of the charges against [him], an explanation of the employer's evidence, and an opportunity to present [his] side of the story" before he was suspended without pay. Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 546, 105 S.Ct. 1487 (1985). Advance notice is not required, Gniotek, 808 F.2d at 244, however "for the informal discussion contemplated by *Loudermill* to be meaningful, the employee must be apprised of the nature of the charges against him or her before or at the time the hearing begins." Moffitt, 160 F.Supp.3d at 793-94 (citing Morton, 822 F.2d at 371 (3d Cir. 1987)).

A pre-suspension hearing's purpose is to "assure there are reasonable grounds to support the suspension without pay." Gilbert v. Homar, 520 U.S. 924, 933, 117 S.Ct. 1807 (1997). "[P]retermination notice of the charges and evidence against an employee need not be in great detail as long as it allows the employee 'the opportunity to determine what facts, in any, within his knowledge might be presented in mitigation of or in denial of the charges.'" McDaniels v. Flick, 59 F.3d 446, 457 (3d Cir. 1995) (citation omitted). "The pretermination hearing merely serves as 'an initial check against mistaken

decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" Id. at 459 (quoting Loudermill, 470 U.S. at 545-46).

Recently, in Jennings-Fowler v. City of Scranton, 680 Fed.Appx. 112, 116 (3d Cir. 2017), the Third Circuit addressed what notice was required with respect to a plaintiff's due process claim alleging insufficient pretermination process. The Court held that "[plaintiff] was entitled to 'oral or written notice of the charges against h[er], *an explanation of the employer's evidence*, and an opportunity to present h[er] side of the story' in connection with the termination meeting." Id. (emphasis original). Significantly, the Court stated that "[f]ailure to describe the nature of evidence supporting termination violates due process." Id. (citation omitted). As such, a plaintiff must be informed of the specific evidence that existed to support each of the charges and must be given a sufficient explanation of the evidence against him/her regarding each of the charges. Charges that do not contain the requisite description and that simply use boilerplate language are not sufficient. Id. Further, "it is sufficient that the charges that were the main focus of the termination hearing failed to provide an explanation of the evidence against [plaintiff]," for the district court to deny summary judgment on plaintiff's pretermination due process claim. Id.

Here, Mahon explained to plaintiff that T.K.'s parent had contacted the administration to let them know about the incident in class with plaintiff and

he explained that plaintiff's actions left a mark on T.K. Mahon then asked plaintiff questions about the incident with plaintiff on April 8th, including a pressure point, and plaintiff responded to them. However, the evidence is disputed whether Mahon's questions were open-ended and failed to cite specific evidence as to each of the charge against the plaintiff and whether the plaintiff gave a demonstration. Thus, even though the plaintiff was given the chance to respond to the incident regarding T.K., the facts are disputed whether he was advised of T.K.'s specific allegations and the evidence regarding T.K. The evidence is undisputed that the plaintiff could not have been advised of any specific evidence and allegations regarding the alleged incidents involving C.K. and S.D., and the charges lodged against him with respect to these two students. In fact, most of the seven grounds for dismissal that were stated in the May 7, 2015 letter Mahon sent the plaintiff related to either C.K. or S.D. As this court stated in Moffitt, 160 F.Supp.3d at 793-94, "subsequent presentation of evidence underlying the charges of which the employee is not adequately informed does not satisfy the demands of due process." (quoting Morton, 822 F.2d at 371). Additionally, even though the plaintiff answered questions during the April 9, 2015 meeting, this did not constitute a meaningful opportunity for the plaintiff to tell his side of the story since there are genuine issues of fact whether the plaintiff was adequately apprised of the charges against him such that he could provide his account of events and an explanation in an informed manner.

Thus, the court finds that there are too many disputed facts concerning

the April 9, 2015 meeting as to whether defendants provided the plaintiff with all of the pre-deprivation process he was due under *Loudermill. See Jennings-Fowler, supra*. Specifically, the court finds that there are disputed facts as to whether the plaintiff had notice of all of the specific grounds and evidence regarding his suspension without pay and, as a result, whether he was given a chance to tell his full side of the story as to each of the specific charge. The plaintiff was entitled to be apprised of the nature of the charges against him before or at the time the hearing begins. [Morton, 822 F.2d at 371 (3d Cir. 1987)](). According to the plaintiff's evidence was not apprised of the subject matter of the April 9, 2015 meeting in advance, and when he arrived at the meeting, Mahon merely began asking him questions. In fact, he was not notified of all of the specific charges until May 7, 2015, almost one month after the purported *Loudermill* hearing, through Mahon's letter. Even though the defendants argue that based on the events that transpired on April 8th regarding the incident between the plaintiff and T.K. this constituted circumstantial evidence of constructive notice of the charges, as plaintiff states, "this argument fails because there are genuine fact questions about what happened during each and every one of the [above stated] interactions [with plaintiff]" that the jury must decide. *See* Moffitt, 160 F.Supp.3d at 795 (this court held that general allegations certain topics were discussed informally with the plaintiff by school officials "does not support the inference that the defendants explicitly notified the plaintiff of any charges against him and that he was being investigated for possible termination."). Further, there

19

is no evidence showing any discussions with plaintiff prior to April 9th regarding the allegations against him with respect to C.K and S.D. Indeed, notice in the plaintiff's case was especially important since "there is nothing in the record indicating a prior history of negative evaluations or incidents involving the plaintiff." Id.

In short, there are disputed material facts regarding plaintiff's pre-deprivation due process claim and, the factfinder will determine whether the plaintiff was afforded all of the due process rights to which he was entitled by *Loudermill* before he was suspended without pay. As such, the jury must determine if the defendants deprived the plaintiff of a legitimate property interest without due process in violation of the 14th Amendment. *See* Mariano v. Borough of Dickson City, 40 F.Supp. 3d 411 (M.D.Pa. 2014) (this court denied summary judgment since the facts of the pre-termination meeting were in dispute and they were material to the issue of what type of process plaintiff was afforded).

Further, as the plaintiff points out, it is of no moment whether Mahon, Elia, and Antonetti lacked the final authority to make the employment decision suspending him without pay, as defendants claim, since the relevant issue is whether these individual defendants deprived the plaintiff of his pre-deprivation due process rights. Indeed, the court has found that the individual defendants had sufficient personal involvement with plaintiff's due process claim and that there are genuine issues of material fact regarding whether the plaintiff was afforded due process under Count I.

Next, the individual defendants argue that they are entitled to qualified immunity arguing that it was not clearly established that they had to provide the plaintiff with a *Loudermill* hearing "in a situation where [plaintiff] was accused of physically assaulting students over whom he was immediately responsible." To establish a claim under §1983, a person must prove that someone deprived him of a constitutional right while acting under the color of state law. Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). Even if the plaintiff satisfies these elements, it does not guarantee that he is entitled to recover damages from the defendant public officials. Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right [ ] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); *see also* Pearson v. Callahan, 555 U.S. 223 (2009). This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F.Supp.2d 664, 671 (M.D.Pa. 2009) (citations omitted).

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201–02 (2001), abrogated in part by Pearson, 555 U.S. 223; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor.

Saucier, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. Pearson, 555 U.S. at 232; Saucier, 533 U.S. at 201–02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

The court is not required to conduct the two inquiries sequentially, Pearson, 555 U.S. at 239–40, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id. Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299–300 (3d Cir. 2000); Crouse, 668 F.Supp.2d at 671; *see also* Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record ... to establish ... a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which

focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. *See* [Montanez v. Thompson, 603 F.3d 243 (3d Cir. 2010)](#).

Here, the court has found that the facts are disputed whether the individual defendants violated the plaintiff's constitutional right to due process. The court now finds that the plaintiff had the right to a pre-deprivation hearing under *Loudermill* and that, based on the facts of this case, this right has been clearly established for many years. Thus, the individual defendants are not entitled to qualified immunity.

Moreover, insofar as defendants claim that they are entitled to immunity under the Pennsylvania Child Protective Services Law ("CPSL"), 23 Pa.C.S.A. §6318, *et seq*., with respect to plaintiff's due process claim, "[t]his statute, [], only provides immunity for alleged violations of state law, and is therefore immaterial to [plaintiff's] federal claim." D.M. v. County of Berks, 929 F.Supp.2d 390, 401 n. 14 (E.D.Pa. 2013) (citation omitted).

Therefore, defendants' motion for summary judgment will be **DENIED** with respect to Count I as against Mahon, Elia, and Antonetti.

Since the court will not grant summary judgment in favor of Mahon, Elia, and Antonetti regarding the plaintiff's 14th Amendment due process claim in Count I, it must now decide whether summary judgment is appropriate for the defendant AHSD with respect to the plaintiff's claim for municipal liability under *Monell* in Count I. With respect to defendant AHSD, the "first inquiry in any case alleging municipal liability under §1983 is the question whether there

is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197 (1989).

In McGreevy v. Stroup, 413 F.3d 359, 367-68 (3d Cir. 2005), the Third Circuit discussed the contours of liability for municipalities and other local governing bodies:

> In Monell v. Dep't. of Soc. Serv., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court established that a municipality cannot be held liable under §1983 for the constitutional torts of its employees by virtue of respondeat superior. Instead, a municipality may only be liable for the torts of its employees in one of three ways: First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, Jett v. Dallas Independent School District, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy, Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes, City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

In this case, as discussed above, the plaintiff was initially suspended by Mahon, an official of AHSD who reports to the School Board and has a seat on the Board with the right to speak on matters before the Board, but not to vote. 24 P.S. §10-801. The evidence shows that Mahon directed the actions with respect to the plaintiff's due process claim, and as plaintiff states, "a jury could more than reasonably find that Mahon is an executive municipal policymaker." *See* Fletcher v. O'Donnell, 867 F.2d 791, 793 (3d Cir. 1989) ("A

single incident violating a constitutional right done by a governmental agency's highest policymaker for the activity in question may suffice to establish an official policy."). The plaintiff has also shown that the other policymaking officials, namely, AHSD and the Board, acquiesced in the decision of Mahon to suspend the plaintiff without pay and acquiesced in all of the alleged unconstitutional conduct. *See* City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."). Following the plaintiff's suspension without pay by Mahon, allegedly without proper notice and a *Loudermill* hearing, AHSD continued the plaintiff's suspension to the present date. Mahon's recommendation to terminate the plaintiff is still pending before the Board. The court finds that there are sufficient facts in the record to show that AHSD ratified Mahon's allegedly unconstitutional actions.

Thus, the defendants' summary judgment with respect to the plaintiff's 14th Amendment claim against defendant AHSD based on *Monell* will also be **DENIED**.

### B. Punitive Damages

The court will now address defendants' contention that they are entitled to summary judgment with respect to plaintiff's claim for punitive damages.

With respect to punitive damages for a §1983 violation, this remedy is only available "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the

federally protected rights of others." Smith v. Wade, 461 U.S. 30 (1983). Regarding federal civil rights claims, "reckless indifference" refers to the defendant's knowledge of the illegality of his actions, not the egregiousness of his actions. Alexander v. Riga, 208 F.3d 419, 431 (3d Cir. 2000) (citing Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999)).

As discussed above, the court finds that the plaintiff has presented sufficient evidence to show that there are disputed material facts as to whether Mahon, Elia and Antonetti violated his due process rights under §1983. The court also finds that the plaintiff has presented evidence showing "reckless indifference" regarding the knowledge of Mahon, Elia and Antonetti of the illegality of their actions to seek punitive damages. *See* Alexander v. Riga, 208 F.3d at 430-31. Moreover, the plaintiff's evidence is sufficient to show that Mahon, Elia and Antonetti, in their individual capacity, took actions against him to indefinitely suspend him without pay for over three years which was done willfully, wantonly, and maliciously.

Thus, defendants' motions for summary judgment will be **DENIED** with respect to plaintiff's claim for punitive damages against Mahon, Elia and Antonetti in their individual capacity.

### *C. State Law Malicious Prosecution Claim, Count III*

The plaintiff asserts a state law malicious prosecution claim, Count III, against defendants Mahon, Elia and Antonetti. To state a claim for malicious prosecution under Pennsylvania law, a plaintiff must allege that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended

in plaintiff's favor; (3) the proceeding was initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice. [Zlomsowitch v. E. Penn Twp., 2012 WL 1569633 (M.D. Pa. May 3, 2012)](#) (citing [Kelley v. Gen'l Teamsters, Local Union 249, 518 Pa. 517, 544 A.2d 940, 941 (Pa. 1988)](#)). "[M]alice may be inferred from a lack of probable cause." Logan v. Salem Baptist Church of Jenkintown, 2010 WL 3364203, *2 (E.D.Pa. Aug. 7, 2010) (citing Kelley, 544 A.2d at 941).

A private citizen can be held liable for a malicious prosecution claim under Pennsylvania law if he "knowingly provides false information to law enforcement" "because such an action 'prevent[s] the police officer from adequately exercising independent judgment as to whether criminal charges should be instituted.'" Reiber v. Fillipone, 2016 WL 7034704, *2 (E.D.Pa. Dec. 2, 2016) (quoting Hess v. County of Lancaster, 514 A.2d 681, 683 (Pa.Commw.Ct. 1986)); *see also* Logan, 2010 WL 3364203, *2. "In order to hold a private person responsible for the initiation of proceedings by a public official, *Hess* stated it must 'appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false.'" Id. (quoting Hess, 514 A.2d at 683). The Reiber Court, 2016 WL 7034704, *3, indicated that the concern in *Hess* "was that giving police false information would prevent them from adequately exercising independent judgment as to whether charges should be instituted."

"In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or show that the information furnished by the private person upon which the official acted was known to be false." Gallucci v. Phillips & Jacobs, Inc., 418 Pa. Super. 306, 316, 614 A.2d 284 (Pa. Super. 1992).

The defendants argue that since probable cause is an absolute defense to a claim for malicious prosecution and since there was probable cause to charge plaintiff with the crimes of assault and endangering the welfare of a child, they can not be held liable on plaintiff's malicious prosecution claim. The plaintiff's evidence indicates that after he was suspended indefinitely without pay, Mahon, Elia and Antonetti conducted an incomplete investigation into the allegations against him by T.K. as well as allegations concerning C.K. and S.D., and that they omitted evidence favorable to him and failed to speak to many of the students who were in the classroom.[6] The plaintiff also presented evidence that the defendants prepared their own investigative report and provided it to the DA's Office and that this Office heavily relied upon the report in deciding to file criminal charges against him soon after receiving the report. While defendants argue that they was sufficient probable cause to file the charges, that the DA's Office made the decision to file

---

[6]Since the plaintiff has summarized his evidence in his brief in opposition, (Doc. 92 at 25-27), it shall not be fully repeated herein.

charges, and that the charges were bound over for court, if there were omissions of evidence favorable to the plaintiff in the probable cause affidavit and in the evidence presented at his preliminary hearing, then the determinations were tainted. The jury must decide if exculpatory evidence was omitted by the defendants with respect to the plaintiff's malicious prosecution claim, and if the criminal charges against him were influenced by the defendants' investigation and report. *See* Burgos v. Morgan, Lewis & Bockius, LLP, 2017 WL 57879, *8 (Pa.Super. Jan. 5, 2017) (Superior Court stated that if "material facts are in controversy, the question [of probable cause] is a mixed one [of law and fact] and it becomes the duty of the jury, under proper instructions from the court as to what will justify a criminal prosecution, to say whether the plaintiff in the civil action has shown want of probable cause upon the part of the defendant." (quoting Wainauskis v. Howard Johnson Co., 488 A.2d 1117, 1122-23 (Pa.Super. 1985)).

Further, as plaintiff points out, only two days after the DA's Office received the report from AHSD, the decision to charge him was made, and when the DA's Office received the report neither the prosecutor nor anyone in the office had interviewed any students except for T.K and his friend, C.K. The plaintiff also presented evidence that the parents of T.K. and C.K. contacted the District Attorney regarding the case, allegedly to influence his decision. Thus, the jury must decide if there was sufficient probable cause since the plaintiff's evidence shows that defendants withheld and misrepresented facts and information to the prosecutor which showed he did

not commit any crime. *See* Burgos, 2017 WL 57879, *6 ("Under Pennsylvania law, a private citizen who reports a suspected crime to law enforcement may be found to have instituted criminal proceedings if he or she (1) knowingly provides false statements to an official; or (2) directs or pressures an official to initiate charges.") (citation omitted). The Superior Court in Burgos, id. at *7, indicated that a state law malicious prosecution claim is largely based upon the Restatement (Second) of Torts §653 (Comment g.) and §654, and stated that "under Pennsylvania law, knowingly omitting material facts from information provided to a prosecuting officer may constitute instituting criminal proceedings, which would form the basis of liability for malicious prosecution." (citations omitted). As such, the evidence that the plaintiff presented regarding the defendants "knowing omission of material facts [is] sufficient to establish malicious prosecution." Id.

The court finds that, in considering the evidence in the light most favorable to the plaintiff, the plaintiff has presented evidence that Mahon, Elia and Antonetti had reason to believe that the information they provided to the prosecutor and the detective was incomplete and that they deliberately omitted material favorable to him. The plaintiff also presented evidence that the prosecution relied heavily on the defendants' investigation and report in its decision to initiate criminal charges against him. Thus, the plaintiff's state law malicious prosecution claim will be allowed to proceed to trial. *See id.*

The defendants also argue that their motion for summary judgment on plaintiff's state law malicious prosecution claim should be granted since as

school district employees they are mandatory reporters and they are immune for reporting of T.K.'s allegation of assault by plaintiff to police under the CPSL since they acted in good faith after meeting with T.K. and his parents.

The CPSL, 23 Pa.C.S. §6352(a)(1), provides that "a school employee who has reasonable cause to suspect, on the basis of professional or other training or experience, that a student coming before the school employee in the employee's professional or official capacity is a victim of serious bodily injury or sexual abuse or sexual exploitation by a school employee shall immediately contact the [school] administrator." The duty to report under the CPSL applies to every "school employee." Id. The CPSL, §6353(a), also provides that a school administrator or employee "shall report immediately to law enforcement officials and the appropriate district attorney any report of serious bodily injury or sexual abuse or sexual exploitation alleged to have been committed by a school employee against a student." Also, as noted above, the CPSL provides immunity for state law tort claims, but the immunity applies to civil or criminal liability that results from the reporting. The immunity further applies if the person acts in good faith in making the report. *See* Good v. Dauphin County Social Services for Children and Youth, 891 F.2d 1087, 1090-91 (3d Cir. 1989).

The plaintiff states that his malicious prosecution claim does not arise out of the defendants' mandatary reports to the ChildLine Registry, rather they arise "out of the sham Report defendants voluntarily submitted to the [DA's] Office almost a month later." The plaintiff also states since he has presented

31

evidence that the defendants made knowingly false reports to authorities, i.e., that they acted in bad faith by disregarding relevant evidence favorable to him and failed to conduct a thorough investigation in order to achieve the result they wanted, he has rebutted the presumption of good faith under the CPSL.

Based on the disputed facts of this case, the court finds that the defendants are not entitled to immunity under the CPSL regarding plaintiff's malicious prosecution claim since the plaintiff presented evidence that the defendants acted in bad faith and since this claim is not based on defendants' reporting the plaintiff to the ChildLine Registry, rather it is based on investigation and report the defendants provided to the DA's Office which was used to determine if criminal charges should be filed against him.

Moreover, the defendants argue that they are immune from plaintiff's state law malicious prosecution claim under the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa.C.S.A. §8501, *et seq*. "The [PSTCA] affords municipalities, municipal agencies, and municipal officers acting in an official capacity immunity from liability for all state law tort claims, unless the suit falls within one of eight enumerated exceptions." Zerby v. Waltz, 2017 WL 386616, *12 (M.D.Pa. Jan. 27, 2017). None of the eight exceptions are alleged in this case. Here, the plaintiff's malicious prosecution claim is against Mahon, Elia and Antonetti in their individual capacity, and "immunity is abrogated for individual employees whose 'acts or conduct ... constitute[ ] a crime, actual fraud, actual malice or willful misconduct.'" Id. *See also* M.S. ex rel. Hall v. Susquehanna Township School Dist., (M.D.Pa. 2014)

43 F.Supp.3d 412, 433 ("The PSTCA also strips an employee of immunity if he or she engages in conduct that is found to constitute 'a crime, actual fraud or willful misconduct.'").

The court in Palmer v. Bartosh, 959 A.2d 508,512-13 (Pa.Cmwlth. 2008), explained:

> Section 8550 of the Act abrogates the defense of government immunity to which a government employee otherwise may be entitled under the Act where it has been judicially determined that the act of the employee caused the injury and that the act was intentional, i.e., constituted a crime, actual fraud, actual malice or willful misconduct. 42 Pa.C.S. §8550; Kuzel v. Krause, 658 A.2d 856 (Pa.Cmwlth.1995). For the purposes of the Act, "willful misconduct" is synonymous with the term "intentional tort" in that the employee must desire to bring about the result that followed his conduct or be aware that the result was substantially certain to follow.

Thus, under §8550, the employees of a local agency are subject to personal liability upon a judicial determination that the employee's act constituted a "crime, actual fraud, actual malice or willful misconduct." Hall, 43 F.Supp.3d at 433. *See also* Renk v. City of Pittsburgh, 537 Pa. 68, 641 A.2d 289, 291 (1994)).

The plaintiff has presented sufficient evidence that the defendants acted with actual and willful misconduct and, thus the defendants are not entitled to immunity from his state malicious prosecution claim under the PSTCA.

Finally, the defendants contend that Mahon is entitled to absolute high public official immunity with respect to the plaintiff's state law malicious prosecution claim. In Feistl v. Luzerne Intermediate Unit, 2016 WL 1162325,

*6 (M.D.Pa. March 24, 2016), this court addressed such immunity and stated:

> "Pennsylvania common law recognizes the doctrine of absolute immunity for 'high public officials.'" Smith v. School District of Phila., 112 F.Supp.2d 417, 425 (E.D.Pa. 2000). Describing the scope of common law immunity, the Pennsylvania Supreme Court has stated, "absolute privilege . . . is unlimited, and exempts a high public official from all civil suits for damages arising out of false defamatory statements and even from statements or actions motivated by malice, provided the statements are made or the actions are taken in the course of the official's duties or powers and within the scope of his authority . . ." Durham v. McElynn, 772 A.2d 68, 69 (Pa. 2001). Although the doctrine of high public immunity originated in defamation suits, *see Lindner, supra*, the Supreme Court of Pennsylvania has stated it may be extended beyond the defamation context so long as the officials' actions were undertaken within the scope of their authority. Jonnet v. Bodick, 244 A.2d 751, 753 (Pa.1968).

More recently, the court in Zurchin v. Ambridge Area School District,

300 F.Supp.3d 681, 694-95 (W.D.Pa. 2018), stated:

> With respect to school board members' immunity, "'[a]n official's status as a high public official for purposes of absolute immunity is determined on a case-by-case basis, and depends on the nature of his duties, the importance of his office, and particularly whether or not he has policy-making functions.'" Graham, 2006 WL 1669881, at *5 (quoting Zugarek v. S. Tioga Sch. Dist., 214 F.Supp.2d 468, 479 (M.D.Pa. 2002) ). However, "high public officials are entitled to absolute immunity from state law suits only when acting in their official capacities." Id. at *5. "School board members, 'entrusted with a policymaking role for the School District, are high public officials entitled to absolute immunity from state law suits when acting in their official capacities.'" Id. at *5 (quoting Zugarek, 214 F.Supp.2d at 479).

The court in *Zurchin* then dismissed the plaintiff's state law claim

against the defendant school officials in their official capacity.

Based on the facts of this case, the court finds that Mahon is a high

public official in regards to absolute immunity. Initially, plaintiff Yelland's malicious prosecution claim is proceeding against Mahon only in his individual capacity. Additionally, since the plaintiff presented evidence showing that Mahon's conduct occurred, in part, "outside the scope of activities that were in connection with school district business", and evidence that he "acted with specific intent to harm [him]" and "maliciously", the court finds that Mahon is not entitled to absolute immunity because there is evidence that his actions were beyond his official authority. *See id.*

## IV.   CONCLUSION

For the foregoing reasons, the court will **DENY** the defendants' motion for summary judgment, (Doc. 74), with respect the plaintiff's 14th Amendment pre-deprivation procedural due process claim contained in Count I of his complaint against AHSD and, against Mahon, Elia and Antonetti in their individual capacity. The court will also **DENY** the defendants' motion for summary judgment regarding the plaintiff's claim for punitive damages against Mahon, Elia and Antonetti in their individual capacity. Further, the court will **DENY** the defendants' motion for summary judgment with respect to plaintiff's state law malicious prosecution claim contained in Count III against Mahon, Elia and Antonetti. An appropriate order shall follow.

S/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: July 2, 2018**
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2016 MEMORANDA\16-2080-06.wpd